# UNITED STATES DISTRICT COURT
## THE DISTRICT OF RHODE ISLAND

**FILED**

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND
2012 NOV 21  P 3: 31

| | |
|---|---|
| Real Party In Interest,<br>Sui juris: carol-danti: king<br>Authorized Representative, Attorney-In-Fact<br>for CAROL DANTI - KING<br>Personal Bond Number RE820372864US ) | **CA 12- 855** |
| Plaintiff, ) | |
| vs. ) | Case No.: _____ |
| ) | |
| DELTA FUNDING d/b/a FIDELITY ) | **PETITION TO SET ASIDE AND VOID** |
| MORTGAGE OF NY CEO HUGH MILLER ) | **FORECLOSURE ACTION, CANCEL** |
| ) | **NOTE AND MORTGAGE, CLAIM IN** |
| HSBC BANK USA NA CEO IRENE ) | **RECOUPMENT, QUIET TITLE, AND FOR** |
| DORNER ) | **DECLARATORY AND INJUNCTIVE** |
| ) | **RELIEF, AND PERMANENT** |
| 100 JOHN AND JANE DOES FIDELITY ) | **INJUNCTION** |
| GROWTH COMPANY FUND (FDGRX) ) | |
| CUSIP 316200104 ) | |

( )
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.,

OCWEN LOAN SERVICING, LLC CEO
JOHN V. BRITTI

SUSAN W. CODY

KORDE AND ASSOCIATES el al

And all persons and entities unknown,
claiming any legal or equitable right, title,
estate, lien, or interest in the property
described in the complaint adverse to
plaintiff's title, or any cloud upon plaintiff's
title thereto.

Does 1 through 15,

COMMONWEALTH LAND TITLE
INSURANCE COMPANY as title agent,
closing agent, title insurance carrier and

nominal Mortgagee on Mortgage Contract )
)
BILL BECKMANN, PRESIDENT AND )
CEO )
Mortgage Electronic Registration Systems, )
Inc. (MERS) )
)
NOEMI MORALES, ASSISTANT )
SECRETARY OF MORTGAGE )
ELECTRONIC REGISTRATION SYSTEMS )
)
MICHAEL J. LEPIZZERA JR. ESQ )
SETTLEMENT AGENT )
)
JOHN OR JANE DOES 1-1000, unknown )
investors JOHN DOES 1-10, being )
undisclosed mortgage aggregators )
(wholesalers), mortgage originators, loan )
seller, Mortgagee of Pooled Assets, )
Mortgagee for holders of certificates of )
Collateralized Mortgage Obligations, )
Morgan Stanley, as investment banker,  et al, )
individually, jointly and severally )

_____ Defendants _____

**Claim of Rights**

Sui juris, as agent for Plaintiff, claims all of Sui juris's rights, including rights under treaty law,

including seniorage rights, at all times and waives none of them at any time for any cause or

reason.  Seniorage rights are defined as all rights delegated under the social compact; e.g., the

constitution for the united States, wherein this sovereign delegated limited power and authority

to government to act on the sovereign's behalf and in the sovereign's best interest.  Plaintiff

hereby invokes the powers and protections of the Constitution of Rhode Island Annotated and

the Constitution of the United States of America Annotated.  Plaintiff hereby invokes the powers

and protections of *Anastasoff v. U.S., 223 F3d 898,* especially where it speaks to the Doctrine of

Precedent.  The *alleged* Plaintiff wishes to point out to the Court that he is NOT an individual

schooled in the law, but as an individual exercising his rights under law for the proper action of the Court from the fraudulent actions on the part of the *alleged* Defendant(s) in question.  As such, the Plaintiff asks the court look to the substance of his pleadings rather than the form and asks the court to take judicial notice pursuant to ***Section 32 of the Judiciary Act of 1789 (1 Stat. 73)*** which specifies that

*"courts respectively shall proceed and give judgment according as the right of the cause and matter in law shall appear unto them, without regarding any imperfections, defects, or want of form."*

The *alleged* Plaintiff further asks the court to take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence of the enunciation of principles stated in *King v. Knoll (No. 04-04149-JAR)*, *Whitney v. State of New Mexico (113 F.3d 1170)*, and *Haines v. Kerner (404 U.S. 519)*, wherein the courts directed that those who are unschooled in law making complaints/pleadings shall have the court look to the substance of the complaint/pleadings rather than the form and hereby makes the following pleadings/notices in the above referenced matter WITHOUT waiver of any defenses.

Plaintiff hereby claims the powers, protections and benefits of the Statute of Frauds Annotated, especially where it speaks to the fact that in order to have standing to sue on a debt or have a court consider the issue or for a court to have subject matter jurisdiction to provide relief or a remedy the Defendant(s) or moving party must prove the existence of a debt which may only be established by submission of the original contract, original promissory note or agreement in open

court, on the record, as evidenced through the testimony of a competent fact witness with personal firsthand knowledge, under oath, and be subject to the test and "fire" of cross examination. Additionally, Defendant or moving party must prove it is the Holder in Due Course and that Plaintiffs signed the contract, note, or agreement with full knowledge of the true nature of the transaction, as required by state and federal law governing disclosure requirements. Further, any party that asserts a claim upon Plaintiff's property must prove with specificity that Plaintiff received equal value, as consideration to the contract, by demonstrating, possession of the original unaltered promissory note and under GAAP (Generally accepted Accounting Principles) how much value was given under GAAP rules to Plaintiff, the source and the nature of the consideration (where in reality did it come from); in order to demonstrate that no fraud occurred in the inducement and that whomever the holder in due course purports to be, has a valid instrument to support a claim under any security agreement upon Plaintiff's property.

Plaintiff hereby makes declaration of non-corporate status. Plaintiff hereby makes declaration of domicile and revokes any previous declaration of domicile. Plaintiff is domiciled in Rhode Island State. Plaintiff hereby makes declaration that his name is "carol danti: king", which is separate and distinct from CAROL DANTI KING, KING, CAROL or any other pseudonym.

The Plaintiff, the Affiant herein, does solemnly affirm that she is of lawful age, being of sound mind and competent to make this affidavit and willing to testify in open court; that the statements herein are from his own personal, firsthand knowledge of the information and facts contained herein and are true and correct in substance and in fact; and that those matters cited herein are believed to be true as reported and as further grounds for the relief sought.

**Jurisdiction**

This court has jurisdiction over this proceeding pursuant to State Statute and under the Rhode

Island Rules of Civil Procedure and this matter arises out of ownership and possession of real

estate property located in the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

RHODE ISLAND.  All of the parties are either domiciled or are doing business in the district in

the STATE OF RHODE ISLAND.

**Standing**

Plaintiff, as secured party on a properly executed Warranty Deed, (Exhibit K), is the true owner

fully vested with all rights to said property and therefore has standing to bring this complaint.

The Plaintiff claims that DELTA FUNDINGS' (d/b/a FIDELITY MORTGAGE OF NY)

assignment of MERS as nominee and mortgagee is void and that the foreclosure sale that was

noticed and was done so in violation of Rhode Island General Laws §34-11-22 and that the

assignment violates Rhode Island General Laws §34-11-1, and is therefore, void under Rhode

Island General Law §34-11-1 et seq. quite simply in *Kiah v. Aurora Loan Servs., LLC, 2010*

*WL 4781849, at *1 (D. Mass. Nov. 16, 2010), Basilia v. GMAC Mortgage, No. 09-J-519,*

*Order (Mass. App. Ct. Dec. 4,2009), Mortgage Elec. Registration Sys., Inc. v. Azize, 965 So. 2d*

*151, 153 (Fla. Dist. 2d Ct. App. 2007)* and *US Bank. N.A. v. Flynn, 27 Misc. 3d 802, 806 (N.Y.*

*Sup.Ct. 2010)* the foreclosing party either had possession of the note or the assignee's rights

were dependent upon ownership of the note. MERS, therefore, in this case at bar, "If the

obligation on is a negotiable note, UCC §3-2-3 is generally understood to make the right of

enforcement of the promissory note transferrable only by delivery of the instrument itself to the

transferee." **See Also:** Restatement (Third) of Property, Mortgages §5.4((c) any other case in Rhode Island that it does not satisfy the standing requirement to either assign or foreclose.

The transfer of and the right to enforce —negotiable loan notes are governed by several provisions of Article 3 of the UCC. Under UCC §3-104, a —negotiable instrument 1) contains an unconditional promise to pay a fixed amount of money; 2) is payable to bearer or to order at the time it is issued or first comes into possession of a holder; 3) is payable on demand or at a definite time; and, 4) does not state any other undertaking or instruction by the promisor to do any action in addition to the payment of money. If any one of these conditions is not met, the loan note is not negotiable and its transfer does not qualify as a negotiation. See: UCC §3-306. Therefore securities are covered under Article 9

Negotiability is important for two reasons. First, UCC Article 3 creates rights to enforce the note only if it is negotiable. See UCC §3-203(b) and §3-301. Second, a negotiable instrument that is transferred to a third party under certain circumstances and who takes the instrument for value, in good faith, without notice that it is overdue or that a party has a defense or claim in recoupment an become a holder in due course. Holder-in-due-course status creates a shield against certain claims and defenses that the Plaintiff could raise against the original payee (lender). In other words, the transferee of a loan note will be immune from many claims and defenses which the borrower could raise against the lender.

If the note is not negotiable, the assignee acquires all rights and is subject to all liabilities of the assignor upon the transfer. RESTATEMENT (SECOND) OF CONTRACTS § 336 (1981); Eggert II, *supra* note 42 at 613. Although the original parties to the note can agree that

provisions of UCC Article 3 apply to determine their respective rights, the transferor of the note cannot amend or eliminate the rights of the original parties in an assignment document.

Historically, the loan note and mortgage traveled together. —The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity. *Carpenter v. Longan, 83 U.S. 271, 274-275 (1872); UCC § 9-203(g)* **(applying this principal to transactions to which Article 9 applies)**; RESTATEMENT (THIRD) OF PROPERTY (MORTGAGE) § 5.4(c); 4 POWELL ON REAL PROPERTY § 37.27[2]. When only the note is transferred, at minimum, an equity interest in the mortgage automatically follows. The transfer of the mortgage typically is completed upon the execution of a formal written assignment. Id. at §§ 37.27[2] and [3]. See: R.I.G.L 34-11-24.

In addition, the Restatement (Third) Property (Mortgages) states that: A mortgage may be enforced only by, or in behalf of, a person who is entitled to enforce the obligation the mortgage secures see: RESTATEMENT (THIRD) OF PROPERTY (MORTGAGE) § 5.4(c). As a result, the party who possesses the right to enforce both the note and the mortgage may sue on the debt and/or foreclose on the security upon default by the borrower.  However, if the note and mortgage are split between different parties, the assignee of only the mortgage holds a worthless piece of paper. RESTATEMENT (THIRD) OF PROPERTY (MORTGAGE) § 5.4. cmt. e; 4 POWELL ON REAL PROPERTY § 32.27[2]. Nonetheless, Rhode Island statutes of frauds mandate that transfers of interests in real property, including mortgages,  be  in  writing. See: 4 POWELL ON REAL PROPERTY § 37.27[1].

For this reason, transfers of mortgages occur by the way of written assignments.  State real estate law also may require the recordation of the assignment because it involves an interest in land, at least before a party can foreclose. Furthermore; when you are dealing in securities it is governed by **Article 8 not Article 3 of the UCC**, what you call a note is a security and it is a non-negotiable instrument. The note cannot be a negotiable instrument if it is subject or governed by extraneous documents outside of the promissory note. And they make it subject to the adjustable rate rider and the deed of trust. There are a dozen cases that say all mortgage notes are non-negotiable instruments. If they are non-negotiable they are not governed by UCC Article 3, there governed by general contract law or Article 8 of the UCC, specifically Restatement of Law Second series under contract Section 164 which has to do with mis-representation and non-disclosure which means its subject to recession.

The plaintiffs' alleged loan was funded by other parties who had made promises to investors whose money was used to fund the mortgage. The very existence of payments by the plaintiff defeats the arguments of the banks and servicers. That leaves the loan undocumented, unsecured and subject to offset for predatory and wrongful lending practices.

Defendant OCWEN LOAN SERVICING, LLC by and through its foreclosing agent SUSAN W. CODY with KORDE AND ASSOCIATES et al, as they have failed to produce any evidence that they were the holder in due course of any instrument granting any rights to foreclose and were acting ultra vires and have no authority to foreclose and no standing to make a claim as a creditor.

The Court in the instant case is requested to set aside and void the foreclosure action, cancel note and mortgage, claim in recoupment, quiet title, and for declaratory and injunctive relief, and permanent injunction.

## Venue

The Venue of this matter is proper within the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND, Providence County, Rhode Island as the subject property in this matter is located within the geographical bounds of the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND, which has sole jurisdiction to hear this matter.

## Parties

The Plaintiff in this action is named carol danti: king who is domiciled in RHODE ISLAND STATE.  The Plaintiff maintains a mailing address at *55 Blackinton Drive, Chepachet, Rhode Island*, and is the successor in interest to this property by way of assignment of one Warranty Deed issued from David M. King and Carol M. King, husband and wife both of Jensen Beach, Florida.

Defendant DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY, a limited liability company believed to be organized under the laws of the STATE OF NEW YORK and of the UNITED STATES with its main office having a mailing address of 1000 WOODBURY ROAD, WOODBURY, NY 11797 (hereinafter referred to as"LENDER"), claims an adverse estate or interest in the subject Property for the purposes of complying with the Quiet Title requirements of the Rhode Island Code Annotated.

Defendant HSBC BANK USA NA a limited liability company believed to be organized under the laws of the STATE OF VIRGINIA and of the UNITED STATES with its main office having a mailing address of 1800 TYSONS BOULEVARD, McLEAN, VIRGINIA, 22101 (hereinafter referred to as "LENDER"), claims an adverse estate or interest in the subject Property for the purposes of complying with the Quiet Title requirements of the Rhode Island Code Annotated.

Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS) a limited liability company believed to be organized under the laws of the STATE of DELAWARE and of the UNITED STATES with its listed corporate heaqdquarters located at 1818 Library Street, Suite 300, Reston, Virginia, 20190 (hereinafter referred to as "MERS").


Defendant SERVICER,OCWEN LOAN SERVICING LLC a professional corporation believed to be organized under the laws of the STATE OF DELAWARE and of the UNITED STATES with its main office having a mailing address of 1661 Worthington Road, #100, West Palm Beach, Florida 33409 (hereinafter "Interloper").

Defendant ATTORNEY MICHAEL J. LEPIZZERA JR. ESQ licensed to practice law in the state of RHODE ISLAND; partner in a full-service title and escrow company having a mailing address of 117 Metro Center Boulevard #2001 Warwick, RI 02886 settlement agent  representing COMMONWEALTH LAND TITLE  (hereinafter ("Settlement Agent").

John and Jane Does are Defendants and Plaintiffs, who are unknown to Plaintiff, carol-danti: king, at this time, but who may be added appropriately to the complaint as they become known.

**Property In Question:**

**55 Blackinton Drive, Chepachet, Rhode Island** with a legal description as follows: That certain lot or parcel of land with all buildings and improvements thereon, situated on the southerly side of Blackinton Drive and southerly of Putnam Pike, in the Town of Glocester, County of Providence, State of Rhode Island and being shown as "A.P. Plat 14, Lot 7" on that plan entitled "Survey Plan of Land, Plat 14, Lots 7 & 22, for Carol Danti King and Gary A. King, Glocester, Rhode Island, May 1, 2007. " A.P. Plat 14, Lot 22" on that plan entitled "Survey Plan of Land, Plat 14, Lots 7 & 22, for Carol Danti King and Gary A. King, Glocester, Rhode Island, May 1, 2007. Reference Instrument 00012303 Book 476 Page 104-108, (Exhibit L)

In or around April 2007, Plaintiff made application to LENDER for a mortgage loan in the amount of Three Hundred and Forty Five Thousand and 00/100 Dollars ($345,000.00)

On or about MAY 31, 2007, CAROL DANTI KING, as trustor, executed a mortgage on the subject property captioned above to secure his performance on a promissory note for Three Hundred and Forty Five Thousand and 00/100 Dollars ($345,000.00) given to DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY.  The DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY "loan" number identifying this matter is 0103422408 dated MAY 31, 2007.

The mortgage was filed for record on June 5, 2007, TOWN OF GLOCESTER located in Providence County, RHODE ISLAND with Recorder's Instrument number 00012304 Book 476 Page 109.(Exhibit D)

Plaintiff made the contractually established monthly payments of $3087.69 from August 1, 2007 through September 2011.

October 5, 2007, Corrective Mortgage, Book 488, Page 79 filed at the TOWN OF GLOCESTER, located in Providence County, RHODE ISLAND with Recorder's Instrument number 00013270. (Exhibit C)

On or about October 19, 2011 the Plaintiff received a "NOTICE OF DEFAULT" letter dated October15, 2011 from Defendant "Interloper" informing the Plaintiff that she was "in default under the terms of the note . . . because [he] has failed to  pay the required monthly installments and late charges."

On or about November 17, 2011 the Plaintiff received a "NOTICE OF DEFAULT" letter dated November 3, 2011 from Defendant "Interloper" informing the Plaintiff that she was "in default under the terms of the note…Because [he] has failed to pay the required monthly installments and late charges."

On or about November 19, 2011, the Plaintiff responds to "Interloper" with a REQUEST FOR DEBT VALIDATION. (Exhibit A)

On or about January 24, 2012, Plaintiff corresponds to "Interloper", with RESPA QUALIFIED WRITTEN REQUEST, COMPLAINT, DISPUTE OF DEBT & VALIDATION OF DEBT LETTER & TILA REQUEST. (Exhibit B)

On or about January 24, 2012, Plaintiff corresponds to "Interloper", with NOTICE: VERIFICATION OF PROOF OF CLAIM REQUEST.

In early February 2012 Plaintiff received two undated and unsigned letters "HELPING HOMEOWNERS IS WHAT WE DO" from Defendant "Interloper" and elected not to respond

based on his understanding that his acceptance of this or any other similar offer would diminish his later access to other more appropriate and definitive rights and remedies under law.

In early February 2012 Plaintiff received a "NOTICE OF DEFAULT AND MORTGAGEE'S RIGHT TO FORECLOSE" from SUSAN W CODY of KORDE & ASSOCIATES, that she was being "instructed by OCWEN LOAN SERVICING, LLC as servicer for HSBC BANK USA, N.A. dated February 3, 2012.

On February 1, 2012 an "ASSIGNMENT OF MORTGAGE", Instrument 00023705, Book 604 Page 221 was filed on the property known as *55 Blackinton Drive Chepachet, Rhode Island*. It was undated and listed HSBC BANK USA, N.A. as "Assignor". This was the first time that the Plaintiff found out that the Note had been changed.

On or about February 13, 2012, Plaintiff responds to SUSAN W. CODY AND KORDE AND ASSOICATES with a letter AS TO ANY FRAUD ON THE CONTRACT, OR TO AN UNCONSCIONABLE CONTRACT OR TO DETERMINE A MEETING OF THE MINDS AS THE MORTGAGE CONTRACT. LOAN NUMBER 103422408

On February 13, 2012, Plaintiff did sign and send a letter via United States Postal Service to SUSAN W. CODY of KORDE & ASSOCIATES, making a demand for "validation request for verification the alleged debt". This letter was in response to the "NOTICE OF DEFAULT AND MORTGAGEES RIGHT TO FORECLOSE" that Plaintiff received.

On September 4, 2012, the Plaintiff received a letter from SUSAN W. CODY of KORDE & ASSOCIATES, "acknowledging receipt of your request for debt validation". Letter alleges that Gary A. King attended a corrective mortgage signing. (Exhibit F)

On October 10, 2012, Plaintiff received a letter of intention to foreclose. The letter also states that the Plaintiff has thirty (30) days to dispute the validity of the debt.

On October 19, 2012, nine (9) days after the above mentioned letter, which gave Plaintiff thirty (30) days to dispute the debt, the Plaintiff received a NOTICE OF SALE letter from SUSAN W. CODY of KORDE & ASSOCIATES.

.

SUSAN W. CODY of KORDE & ASSOCIATES has failed to respond in a timely manner and failed to respond to the Notary as it was directed in any of the letters that Plaintiff sent.

As a result of SUSAN W. CODY of KORDE & ASSOCIATES failure to provide the Verification as required by statute Plaintiffs by authority of statue hereby make a Declaration of Good Faith Statement of Account of $0.

Nature of the Action

1. This case arises out of Defendants' egregious and ongoing and far reaching fraudulent schemes for improper use of Plaintiff's identity, negligent and/or intentional misrepresentation of appraised fair market value upon which Plaintiff was contractually bound to rely and factually entitled to rely, fraud in the inducement, fraud in the execution, usury, and breaches of contractual and fiduciary obligations as Mortgagee or "Mortgagee" on the Mortgage, "Mortgage Brokers," "Loan Originators," "Loan Seller", "Mortgage Aggregator," "Mortgagee of Pooled Assets", "Mortgagee or officers of Structured Investment Vehicle", "Investment Banker", "Mortgagee of Special Purpose Vehicle/Issuer of Certificates of 'Asset-backed Certificates'",

"Seller of 'Asset-Backed' Certificates (shares or bonds)," "Special Servicer" and Mortgagee, respectively, of certain mortgage loans pooled together in a trust fund.

2. The participants in the securitization scheme described herein have devised business plans to reap millions of dollars in profits at the expense of Plaintiff and other investors in certain trust funds.

3. In addition to seeking compensatory, consequential and other damages, Plaintiff seeks declaratory relief as to what (if any) party, entity or individual or group thereof is the owner of the promissory note executed at the time of the loan closing, and whether the Mortgage (Mortgage) secures any obligation of the Plaintiff, and A Mandatory Injunction requiring reconveyance of the subject property to the Plaintiff or, in the alternative a Final Judgment granting Plaintiff Quiet Title in the subject property.

3.1 Defendant OCWEN LOAN SERVICING, LLC by and through its foreclosing agent SUSAN W. CODY with KORDE AND ASSOCIATES et al, as they have failed to produce any evidence that they were the holder in due course of any instrument granting any rights to foreclose and were acting ultra vires and have no authority to foreclose.

3.2 As a result of Defendant MERS acting as mortgagee passing false information to Defendant HSBC BANK USA NA acting As Mortgagee for Fidelity Growth Company Fund (FDGRX); No Minors, CUSIP NUMBER 315912816failing to verify Defendant HSBC BANK USA NA was a legitimate holder in due course and foreclosing on Plaintiff's property has caused and injury to Plaintiff by alienating her from her property.

**Facts**

**Summary of the Facts of this Case**

4. Plaintiff is the nominal payor on the subject promissory Note. The Loan Seller is a financial

institution that was paid a fee to pose as a residential mortgage lender, when in fact the source of

loan funds and the actual lender (Investors in Certificates) and underwriter (Mortgage

Aggregator and Investment Banker) were other parties whose identities and receipt of fees and

profits were withheld from Plaintiff at Closing and despite numerous requests continue to be

withheld from Plaintiff by the Defendants contrary to the requirements of Federal Law and

applicable State Law.

5. Unknown to Plaintiff, the Loan Seller, acting as principal in its relationships with the

"independent appraiser" of the property and the mortgage broker and mortgage originator,

induced the Plaintiff into a transaction that did not and could not meet normal underwriting

standards for a residential mortgage. The Loan Seller posed as a conventional mortgage lender

thus leading Plaintiff to reasonably believe that the Loan Seller, the mortgage broker, and the

loan originator had an interest in the success (repayment of the alleged loan) of the transaction

that Plaintiff was induced to believe was being executed at the time of the "closing" of the

subject loan transaction.

6. In fact, the Loan Seller, mortgage broker, appraiser, loan originator, title agent, escrow agent

and Mortgagee on the MORTGAGE, had no financial stake (i.e., liability) in the transaction and

no interest other than obtaining Plaintiff's signature on a "loan" that could never be repaid, contrary to representations and assurances from the conspiring participants in this fraudulent scheme. In fact, the "Appraisal" was intentionally and knowingly initiated along with other loan data to justify the closing of the "alleged loan transaction."

7. Plaintiff relied upon the due diligence of the apparent "Lender" (i.e., actually the Loan Seller) in executing the documents and accepting the closing documents. In fact, no "lender" was involved in the closing in the sense of an entity performing due diligence and evaluation pursuant to national standards for underwriting and evaluating risk of loaning money in a residential loan closing.

8. Thus no bank or other financial institution actually performing under the standards, rules and regulations governing such institutions was the "lender" which is the basis for Plaintiff's cause of action for usury, to wit: that the initiated appraisal added an undisclosed cost to the loan which when added to the other terms, disclosed and undisclosed, and amortized over the real expected life of the "loan" exceeds the limits set by the State legislature for usury and is not subject to exemption because the presence of a financial institution in the transaction was a ruse in which the form of the transaction covered over and mislead the Plaintiff as to the real parties in interest and the fees generated by the production of the subject "loan transaction."

9. Their purpose was solely to collect fees, rebates, kickbacks and profits that were never disclosed to Plaintiff and have only recently been discovered by Plaintiff through consultation with experts in securitization of residential mortgage loans, and diligent research including the

filings of some parties with the Securities and exchange Commission which disclose the normal manner of operating this fraudulent scheme.

10. Plaintiff has repeatedly requested and demanded compliance with Qualified Written Requests under Real Estate Settlement Procedures Act, the Truth in Lending Act, and other applicable state and Federal Statutes which the Defendants have either ignored or refused to acknowledge or refused to resolve, copies of which demands are attached hereto as Exhibits and incorporated herein.

11. Due to the maturity the note being more than 9 months the Plaintiff is dealing with a security not a negotiable instrument (note). A promissory note is a security because it has a maturity of more than 9 months. In the instant case my note matures in 30 years. See Title 15 77c §(a) (3); "any note that has a maturity of 9 months or less is excluded from the definition of a security."

12. The Plaintiff notices the Defendant's that there is supposed to be a disclaimer in the credit application under Title 16 CFR 433.2. Which says that the buyer/seller take it subject to all the defenses and claims that the buyer could assert against any transferee or any buyer who buys it? Or anybody who sells it.

12.1. The Plaintiff finds a missing disclaimer in the credit application required under Title 16 CFR 433.2 was never written into my loan application. That means there is no holder in due course. A reading of UCC 3-302 states that "a holder in due course takes it free of all claims and defenses that the payor could assert against any payee or assignee or transferee." This error of

non-disclosure did not preserve the affiants' claims and defenses, and is subject to unfair or

deceptive acts or practices which nullifies the security agreement.

13. The plaintiff has a claim in recoupment under UCC 3-305 where an obligor is not obliged to

pay the instrument if the person seeking enforcement of the instrument does not have rights of a

holder in due course and the obligor proves that the instrument is a lost or stolen instrument.

147. Under UCC 3-306 the Plaintiff has a proprietary and possessionary and property interest in

the note and its proceeds. The affiant has the right to rescind negotiation of the transaction (the

endorsement on the note.)

15. The Lender is DELTA FUNDING CORPORATION d/b/a FIDELITY MORTGAGE OF NY

and was named as the Payee on the subject promissory note and the Mortgagee under the

mortgage terms allegedly securing the performance under the subject note. The "Mortgagee" was

named as the Mortgagee on the Mortgage executed at the time of the alleged "closing" of the

"loan transaction." In accordance with State law, the Deed and terms of security were recorded

in the county records. (Exhibit N)

16. Notwithstanding the above, and without the knowledge of the Plaintiff, the Loan Seller had

entered into Assignment and Assumption Agreements with one or more parties and Pooling and

Service Agreements with one or more parties including but not limited to the mortgage

aggregator prior to or contemporaneously with the "Closing" of the subject "loan transaction."

16.1. Under the terms of these agreements, the Loan Seller received a sum of money, usually on receiving an application for a loan equal to the gross amount of the loan sought by Plaintiff plus a fee of 2.5% or more which was allocated to the subject loan transaction.

17. Contrary to the documents presented before and during the "closing" of the "loan transaction" the Loan Seller was neither the source of funding nor the "Lender."

17.1. Thus at the time of recording, the source of funding and the "Lender" was a different entity than the nominal mortgagee or beneficiary under the Mortgage and was neither named nor disclosed in any fashion.

17.2. The security for the "loan" thus secured an obligation that had been paid in full by a third party. Said third party(ies) was acting as a financial institution or "Lender" without even having been chartered or registered to do so despite regulations to the contrary from laws and rules of State or Federal authorities and/or agencies.

18. Some form of documentation represented by the Loan Seller to the Mortgage Aggregator was presented before or contemporaneously with the "closing" of the loan" transaction. In some cases the documentation included actual copies of the documents presented at "Closing."

18.1. In most cases it consisted of either forged blank notes or vague descriptions of the content of the notes that were placed into the pool of assets that would be "securitized."

18.2. Plaintiff has discovered numerous cases in which the "loan closing" either did not take place at all or included documentation substantially different than the original offer and acceptance and substantially different than what could have been reported to the Mortgage Aggregator prior to the "closing." Plaintiff has discovered numerous cases in which foreclosure has proceeded despite the fact that no loan closing was ever consummated, no papers were ever signed, or the loans were properly rescinded properly under law.

18. Plaintiff does not know what version of documentation was presented to the Mortgage Aggregator and if the Mortgage Aggregator took one or more varying descriptions of the "loan documents" into more than one pool of assets which was eventually sold for the purpose of securitizing the assets of the pool which included the subject loan transaction either once or more than once. Plaintiff has requested such information numerous times only to be met with complete silence and defiance or obfuscation from the Defendants.

19. There is no assignment of the subject mortgage in the county records, but there is a non-recorded Pooling and Services" Agreement and a non-recorded Assignment and Assumption Agreement which appears to substitute the Mortgagee over the pooled assets for the nominal Mortgagee in the Mortgage.

19.1. The powers of this second Mortgagee were in turn transferred to either a Mortgagee for a Special Investment Vehicle (which performed the accounting  and reporting of the pool assets) or to an investment bank Collateral Debt Obligation manager whose department performed the accounting and reporting of the pool assets.

19.2. The reporting of the pool assets consisted principally of descriptions of the notes "signed" by borrowers and limited descriptions of the general terms of the note such that the note appeared to be more valuable than the initial terms of payment by the "borrower."

20. The note from the subject "loan transaction" was eventually allocated into a new corporation (Special Purpose Vehicle) formed for the express purpose of holding the pooled assets under certain terms.

20.1. The terms included the allocation of payments from one note to pay any deficiency in payment of another note in unrelated "loan transactions" contrary to the terms of each such note which required payments to be allocated to the principal, interest, escrow and fees associated with only that specific "loan transaction."

20.2. Whether such "deficiency" was caused by the difference between the higher general terms of description of the note or the lower actual payment requirements from the "borrower" is not known, despite numerous requests for accounting and the refusal of Defendants to provide any such information.

21. The Investment Banking firm arranged through payment for a false initiated appraisal of the certificates and/or issuer of the certificates that would be sold to investors in much the same way as it had procured the false appraisal of the property that "secured" the "loan transaction." In addition, insurance was purchased from proceeds of this transaction, credit default swaps were

purchased from proceeds of this transaction, the investors investments were "oversold" to create

a reserve pool from which the SPV could pay deficiencies in payments, and the SPV created

cross-collateralization agreements and overcollateralization of the pool assets to assure payments

to the investors, thus creating co-obligors on the payment stream due from the Plaintiff on the

subject "loan transaction."

22. The pool assets, including the Plaintiff's subject "loan transaction "were pledged completely

to the owners of the "asset-backed securities." All the certificates were then transferred to a

Seller who in turn sold the certificates in varying denominations, each of which had slightly

different terms depending upon which segment of the pool (tranche) secured the investment.

23. If there is a holder in due course of the Plaintiff's note arising from the subject "loan

transaction" it is the investors who purchased said securities (certificates). Some of said

securities are held by the original purchaser thereof, others were sold at weekly auction markets,

others were paid by re-sales of property that was "secured", others were paid from prepayments,

others were paid by sale at full or partial price to the investment bank that originated the entire

transaction, some of which might be held by the Federal Reserve as non-recourse collateral, and

others might have been paid by one or more of the insurance, credit default swaps, cross

guarantees or cross collateralization of the segment of the pool that's secured the relevant

investor who owned certificates backed by a pool of assets that included the subject "loan

transaction."

24. It is doubtful that any of the Defendants have any knowledge or have made any effort to determine whether the putative holders in due course have been paid in whole or in part. It can only be said with certainty that these Defendants seek to enforce loan documents for which they have already been paid in full plus illegal fees for participating in an illegal scheme. These Defendants seek to add insult to injury by demanding ownership of the property in addition to the receipt of payment in full long before any delinquency or default even allegedly occurred.

25. In order for these Defendants to maintain legal standing in connection with the subject loan transaction they are required to show the entire chain of title of the note and the entire chain of title of the mortgage. They have refused to do this despite numerous requests, leading Plaintiff to conclude that the Defendants cannot produce such evidence of a complete chain of title or are intentionally withholding the information that would show breaks in such chain.

26. Plaintiff is left in the position of being in an adversary proceeding with ghosts. While these Defendants have informally offered or considered providing indemnification for any third party claims, the fact remains that any relief awarded these defendants; any standing allowed to these defendants would expose the 27. 27. Plaintiff to multiple claims and suits from an unknown number of parties and entities that all claim, possibly correctly, to the holders in due course. Any grant of ac certificate of title to an entity other than Plaintiff or the nominal mortgagee creates an incurable defect in title.

28. There is no recording of any document in the county records which predates the Defendants' attempt to initiate foreclosure and/or eviction or which would authorize them to proceed.

29. DELTA FUNDING/DBA FIDELITY MORTGAGE and OCWEN LOAN SERVICING, LLC are in violation of the Statute of Frauds, a legal doctrine that requires that certain types of contracts be reduced to a writing in order to be enforceable.

29.1. DELTA FUNDING/DBA FIDELITY MORTGAGE and OCWEN LOAN SERVICING, LLC are not dealing in a mortgage loan, they are dealing in an investment contract called a Pooling and Servicing Agreement and DELTA FUNDING/DBA FIDELITY MORTGAGE and OCWEN LOAN SERVICING, LLC are holding me liable on a contract that I am not a party to. See: *Secrest v. Security National Mortgage Loan Trust 2002-2*

**Significance of REMIC**

30.Mortgage backed Securities (MBS) Certificates are "pass through Certificates," where the Trust has elected to be treated as a Real Estate Mortgage Investment Conduit ("REMIC") to enjoy the tax exempt status allowed under 15 U.S.C. §§806A-G.

30.1. REMIC regulations impose very strict limitations as to the nature of the investments a REMIC trust may make (i.e. "permitted investments") and transactions which it may not undertake (i.e. "prohibited transactions").

30.2. Any violation of REMIC regulations has significant tax implications for the Trust, as well as all Certificate holders. For example, any income realized by the Trust from a "prohibited transaction" is taxed at 100%.

30.2.1. The REMIC regulations also provide that any entity that causes the REMIC regulations to be violated is liable to the Trust and the Certificate holders for the entire amount of the tax.

30.3. Only income from "qualified mortgages" and "permitted investments" may enter a REMIC trust.

30.4. A "qualified mortgage" is an obligation (i.e. mortgage) which is principally secured by an interest in real property which (1) was transferred to the Trust on the startup date, (2) was purchased by the REMIC Trust within 3 months after the startup date or (3) any qualified replacement mortgage.

30.5. Permitted investments are limited to:

30.5.1. Cash Flow Investments (i.e. temporary investment where the Trust holds money it has received from qualified mortgages pending distribution to the Certificate holders);

30.5.2. Qualified Reserve Assets (i.e. any intangible property which is held for investment and is part of a reasonably required reserve to provide for full payment of expenses of the REMIC or amounts due on regular interests in the event of defaults on qualified mortgages or lower than expected returns on cash flow investments.

30.5.2.1. These investments are for very defined purposes and are to be passive in nature. They must be "reasonably required."

30.5.3. Liquidation Proceeds from "foreclosed property" which is acquired in connection with the default or imminent default of a "qualified mortgage" held by the Trust.

30. In order to maintain the REMIC status, the Mortgagee and the Servicers must ensure that the REMIC receives no income from any asset that is not a "Qualified Mortgage" or a "Permitted Investment." 26 U.S.C. § 806F(a)(2)(B).

30.1. Prohibited Transactions include the disposition of a qualified mortgage (except where the disposition is "incident to" the foreclosure, default, or imminent default of the mortgage); or the receipt of any income from an asset that is not a Qualified Mortgagor a Permitted Investment. 26 U.S.C. § 860F(a)(2)(B).

30.2. Prohibited Transactions are taxed in an amount 100% of the REMIC's net income from such prohibited transaction. 26 U.S.C. § 860F(a)(1).

30.3. Contributions of any "property" – e.g., cash, mortgages, etc. – made to the REMIC are taxed at 100% of the contribution, except for the four following exceptions:

30.3.1. Contributions to facilitate a "clean up call" (i.e. the redemption of a class of

30.3.2. regular interest, when by reason of prior payments with respect to those interests

30.3.3. the administrative costs associated with servicing that class outweigh the benefits

30.3.4. of maintaining the class. Reg. § 1.860G-2(j)(1).

30.3.5. Any cash payment in the nature of a guarantee, such as payments to the REMIC Any violation of REMIC regulations will defeat the privileged tax status and will subject the REMIC to 100% taxation, plus penalties and interest. These taxes and penalties are ultimately borne by the Certificate holders under a surety bond, letter of credit or insurance policy.

30.3.6. Any cash contribution during the three month period after the start-up day; and any cash contribution to a qualified reserve fund made by a holder of a residual interest.

31. On a monthly basis, the Investment Banking firm and/or its agents, servants or employees compiled, individually and in concert, oversaw and approved all the information contained in the Distribution Reports and electronically sent same to certain parties.

31.1. Based upon research performed by experts on behalf of the Plaintiff the data regarding the number of bankruptcies, aggregate Special Servicing Fees, and aggregate Trust Fund Expenses was routinely incomplete, false, and/or misleading.

31.2. Further said report intentionally obfuscated the illegal allocation of payments, the failure to disclose payments, and the effect on the alleged obligation of the Plaintiff, to wit: despite numerous insurance products, credit default swaps, cross collateralization, over collateralization

and polling at multiple levels, money received by some or all of these Defendants under the pretense of it being a "Mortgage Payment" was in fact retained, reserved, applied to non-performing loans to make them appear as though they were performing loans, or paid as fees to the enterprise Defendants described in this complaint.

31.3. Based upon the failure of the Defendants to respond, Plaintiff has every reason to believe that the party receiving the payments (OCWEN LOAN SERVICING LLC) is neither the holder in due course of the note nor the owner of any rights under the mortgage provisions of the Mortgage.

31.3.1. Further, Plaintiff has every reason to believe that her payments are not being forwarded to the holder in due course of the note nor to any other authorized party.

31.3.2. Accordingly Plaintiff is in jeopardy, to wit: the true holder in due course and potentially dozens or even thousands of third parties could come forward claiming an unsatisfied interest in the promissory note and may or may not be subject to Plaintiff's various affirmative defenses and counterclaims.

31.3.3. In fact, research has revealed that in various states, such security interests are being purchased by speculators who then seek to enforce said liability, preventing the Plaintiff from claiming the most basic defense, to wit: payment exactly as required by the terms of the note which was cashed by the receiving party (Countrywide) apparently without authority to do so.

31.3.4. Defendants have failed and refused to reveal the true source of funds for the alleged loan transaction, further preventing Plaintiff's right of three-day rescission under the Truth in Lending Act because the real lender has not been revealed and therefore the Notice of Rescission by the Plaintiff has no authorized addressee.

31.3.5. The fact that the "loan" was table-funded without a disclosed source of funds and without disclosing tens of thousands of dollars in fees all contrary to the requirements of state and federal law was withheld from plaintiff by Defendants and continues to be withheld by them. But for the expenditure of time, money and effort on research, Plaintiff would not have discovered the various deceptions of the Defendants at the alleged loan closing.

31.3.6. Plaintiff alleges the closing was an "alleged loan closing" because in fact it was part of an undisclosed hidden illegal scheme to issue unregulated securities (mortgage backed securities) based upon the negotiation of non-negotiable notes, the terms of which had been changed, altered, amended or modified AFTER the execution by the Plaintiff.

31.3.7. Defendants then purported to "negotiate" the note by adding terms which allowed the proceeds of the note to be allocated to the payment of the notes of other borrowers and adding co-obligors as aforesaid through insurance, guarantees, additional collateralization and reserves all of which were undisclosed, as aforesaid.

31.3.7.1. The note was not negotiable because it was no longer an unconditional promise to pay by the original borrower. The terms had changed, adding conditions to payment that were inherent in the "securitization process" that Defendants fraudulently promoted.

31.3.8. Said "negotiation" of Plaintiff's note was in actuality the theft of his/her identity to hide the vast number of "toxic waste mortgages, notes and obligations that the enterprise defendants were selling up through their "securitization" chain.

31.3.8.1. The result of this was that notes from other borrowers wherein there was virtually no possibility of performance were disguised as being of the same class as Plaintiff's Note.

31.3.8.2. These disguised notes carried interest rates sometimes as high as 16.5% which under disguise were then sold to unsuspecting investors as triple AAA investments providing the investor with approximately 6-8% return.

31.3.8.3. By selling virtually worthless "negotiable" paper at par or in the case of toxic waste paper, 2-5 times par, the enterprise defendant reaped profits in the hundreds of thousands of dollars on each such "transaction." for example, if the toxic waste paper would under cover of Plaintiff's credit rating and identity was sold at an investment return of 6% and the mortgage note carried a principal balance of $300,000, the enterprise Defendants sold the "investment "certificates on that "loan" for approximately $740,000 and thus received $440,000 in illegal, fraudulent and undisclosed "profits" or "fees" in a $300,000 mortgage transaction.

31.3.8.4. Thus the economics of mortgage origination changed, to wit: the worse the loan, the more money the enterprise defendants made as long as there were enough people, like Plaintiff, whose identify was used to hide the high volume (and high profit) of toxic waste loans.

31.3.8.5. It was thus in the financial interest of the enterprise Defendants to create unrealistic and false market expectations, deceiving the public as a whole in specified geographical areas of the country that were identified by these enterprise Defendants as targets.

31.3.8.6. Since these illegal profits were not disclosed, the Plaintiff is entitled to an accounting and a pro rate share of the profits obtained by the illegal, improper and undisclosed use of her name, credit rating and identity.

31.3.8.7. The Defendants are dealing in securities which are governed by Article 8; what they call a note is a security and it is a non-negotiable instrument. The adjustable rate rider that goes with the note modifies the conditions of payment and supplements and governs the promissory note. The promissory note can't be a negotiable instrument if it is subject or governed by extraneous documents outside of the promissory note. It is subject to the adjustable rate rider and the Mortgage. The Defendants misrepresentation of the note allows for a remedy of rescission.

32. The Distribution Reports are supposed to accurately reflect the "financial health of the trust, "and provide Certificate holders, with important data such as the number of loans in bankruptcy, the aggregate amount of special servicing fees, and the aggregate amounts of trust fund expenses. Each and every one of these categories is essential for to assess its profit and loss potential in the

REMIC entity. Furthermore, this data is used by bond rating agencies to assess the value of the Certificates.

33. Based upon the filings and information of the Plaintiff it appears that no accurate accounting has ever been presented to anyone and that therefore the identity and status of any putative holder in due course is completely shrouded in secrecy enforced by these Defendants, their agents, servants and employees.

33.1. Unreported repurchases of certificates or classes of certificates would and did result in a profit to the REMIC that went unreported, and which was not credited to Borrowers where the repurchase was, as was usually the case, the far less than the original investment.

33.2. While the Plaintiff would never have entered into a transaction in which the true nature of this scheme was revealed, any profits, refunds, rebates, fees, points, costs or other income or gain should be credited on some basis to said borrowers including Plaintiff herein.

34. Between May 1, 2007, a now-bankrupt DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY in conjunction with HSBC BANK USA NA illegally decoupled (separated) ownership of a note, which listed DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY, from ownership of the RHODE ISLAND-recorded Mortgage, which in contrast listed the 'mortgagee' as MERS.

34.1. This now-bankrupt DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY note was created in the name of a previous owner of Plaintiff's property at *55 Blackinton Drive, Chepachet, Rhode Island.*

35. A null security agreement is unenforceable for foreclosure or cloud on title in Rhode Island. Quiet Title is the only option.

36. Defendants' Decoupling Separation violates the long-standing precedence of *Carpenter v. Longan, 83 U.S. 271.*

37. Said Mortgage was indeed separated from the note, one or more times, making it null, deficient, and illegal. Said nullity is an improper cloud on title.

38. The Plaintiff has proof that an agent from the office of MICHAEL J. LEPIZZERA JR. CLOSING ATTORNEY appeared at the clerk's office and made changes on the Original Mortgage making the Original Mortgage and the Note null and void. The only way the subject instrument could legally be altered is by one of two ways one (1) transfer by valid negotiation of the instrument or by (2) that a new settlement closing be held by a settlement agent with all parties present to witness the alteration and signatures where the settlement agent is to oversee the closing process and full disclosure is provided to the unsophisticated consumer according to RESPA HOPEA and The Truth in Lending Act.  (Exhibit I) (Exhibit J)

38.1. Because of deliberate, conscious, or willful neglect in the act of tampering with public records by alteration of the Original Mortgage (especially in the phrase dereliction of duty) willful neglect, as of duty or principle; the Plaintiff brings forth a defense in the foreclosure actions as follows (1) forgery of the instrument; (2) alteration of the instrument (3) nullification of the note. A violation of RHODE ISLAND GENERAL LAWS §§§11-18-6; 11-18-8; 11-18-9.

## General Allegations

1. The end result of the false and misleading representations and material omissions of Defendants as to the true nature of the mortgage loan actually being processed, which said Defendants had actual knowledge was in direct conflict with the original Uniform Residential Loan Application, early TIL, and Plaintiff' stated intentions and directions to said Defendants at the time of original application for the loan, fraudulently caused Plaintiff to execute

2. predatory loan documents.

3. Defendants engaged in a pattern and practice of unfair or deceptive acts or practices to take or receive a consumer credit contract which fails to contain the following provision in at least ten point, bold face, type: (under Title 16 CFR 433.2) NOTICE ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL

NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER. That means there is no holder in due course.

4. At no time whatsoever did Defendants ever advise Plaintiff (nor, as far as Plaintiff can determine, any "investor" in certificates of mortgage-backed securities) that:

5. the mortgage loan being processed was not in their best interest;

6. the terms of the mortgage loan being processed were less favorable than the fixed-rate loan which Defendants previously advised Plaintiff that they qualified for;

7. that the mortgage loan was an inter-temporal transaction (transaction where terms, risks, or provisions at the commencement of the transaction differ at a later time) on which Plaintiff was providing cover for Defendants' illegal activities.

8. that Plaintiff would likely be placed in a position of default, foreclosure, and deficiency judgment regardless of whether she met her loan obligations once the true lender or true holder(s) in due course appeared; that the originating "lender", that being DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY and/or MERS and/or undisclosed third parties, had no intention of retaining ownership interest in the mortgage loan or fully servicing same and in fact may have and probable had already pre-sold the loan, prior to closing, to a third party mortgage aggregator pursuant to previously executed

documentation (Assumption and assignment Agreement, Pooling Services Agreement, etc. all executed prior to Plaintiff's "loan Closing."

9.  that the mortgage loan was actually intended to be repeatedly sold and assigned to multiple third parties, including one or more mortgage aggregators and investment bankers (including but not limited to Defendants DOES 1-10), for the ultimate purpose of bundling the Plaintiff' mortgage with hundreds or perhaps thousands of others as part of a companion, support, or other tranche in connection with the creation of a REMIC security known as a Collateralized Mortgage Obligation ("CMO"), also known as a "mortgage-backed security" to be sold by a securities firm (and which in fact ended up as collateral for Asset-Backed Securities Certificates, created the same year as the closing);

10. that the mortgage instrument and Promissory Note may be sold, transferred, or assigned separately to separate third parties so that the later "holder" of the Promissory Note may not be in privity with or have the legal right to foreclose in the event of default;

11. that in connection with the multiple down line resale and assignment of the mortgage and Promissory Note that assignees or purchasers of the Note may make "pay-downs" against the Note which may affect the true amount owed by the Plaintiff on the Note;

12. that a successive assignee or purchaser of the Note and Mortgage may not, upon assignment or purchase, unilaterally impose property insurance requirements different

from those imposed as a condition of the original loan (also known as prohibition against increased forced-placed coverage) without the Plaintiff' prior notice and consent.

13. As a result of the closing and in connection therewith, Defendants placed the Plaintiff into a pool of a sub-prime adjustable rate mortgage programs, with Defendants intentionally misleading Plaintiff and the other borrowers and engaging in material omissions by failing to disclose to Plaintiff and other borrowers the fact that the nature of the mortgage loan applications had been materially changed without Plaintiff's knowledge or consent, and that Plaintiff was being placed into a pool where the usual loan was an adjustable rate mortgage program despite borrowers not being fully qualified for such a program.

14. Because of deliberate, conscious, or willful neglect in the act of tampering with public records by alteration of the Original Mortgage the Plaintiff brings forth a defense in the foreclosure actions as follows:

    (a)    forgery of the instrument;

    (b)    alteration of the instrument

    (c)    Nullification of the note.

    (d)    A violation of RHODE ISLAND GENERAL LAWS §§§11-18-6; 11-18-8; 11-18-9.

    (e)    Rescission; see: *Lummus Co. v. Commonwealth Oil Refining Co., Inc.,* 280 F.2d 915 (1st Cir. 1960)

15. Prior to the closing, DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY, and/or

    MERS and/or undisclosed third parties failed to provide to Plaintiff the preliminary

    disclosures required by the Truth-In-Lending Act pursuant to 12 CFR (also known as and

    referred to herein as "Regulation Z) §226. 17 and 18, and failed to provide the

    preliminary disclosures required by the Real Estate Settlement Procedures Act

    ("RESPA") pursuant to 24 FR sec. 3500.6 and 35007, otherwise known as the GFE.

16. Defendant DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY, and/or MERS

    and/or undisclosed third parties also intentionally failed and/or refused to provide

    Plaintiff with various disclosures which would indicate to the Plaintiff that the consumer

    credit contract entered into was void, illegal, and predatory in nature due in part to the

    fact that the final TIL showed a "fixed rate" schedule of payments, but did not provide

    the proper disclosures of the actual contractually-due amounts and rates.

17. Defendants failed and/or refused to provide a HUD-1 Settlement Statement at the closing

    which reflected the true cost of the consumer credit transaction. As Defendants failed to

    provide an accurate GFE or Itemization of Amount Financed ("IOAF"), there was no

    disclosure of a Yield Spread Premium ("YSP", which is required to be disclosed by the

    Truth-In-Lending Act) and thus no disclosure of the true cost of the loan.

18. As a direct and proximate result of these failures to disclose as required by the Truth-In–

    Lending Act, Defendant DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY,

and/or MERS in a substantial amount of without preliminary disclosure, which is a per se violation of 12 CFR sec. 226.4(a), 226.17 and 18(d)and (c)(1)(iii). The YSP raised the interest rate which was completely unknown to or approved by the Plaintiff, as they did not received the required GFE or IOAF. See: *Town of Johnston v. MERS et al 7-15-2012*

19. In addition, the completely undisclosed YSP, as it appears on SETTLEMENT STATEMENT, line 802, page 2, 2% for $6900.00, (Exhibit O) was not disclosed by Defendant in their broker contract, which contract was blank in the area as to fees to be paid to Defendant. This is an illegal kickback in violation of 12 USC sec. 2607 as well as State law which gives rise to all damages claims for all combined broker fees, costs, and attorneys' fees.

20. The Amount Financed within the TIL is also understated which is a material violation of 12 CFR sec. 226.17 and 18, in addition to 15 USC sec. 1602(u), as the Amount Financed must be completely accurate with no tolerance.

21. Defendants were under numerous legal obligations as fiduciaries and had the responsibility for overseeing the purported loan consummation to insure that the consummation was legal, proper, and that Plaintiff received all legally required disclosures pursuant to the Truth-In-Lending Act and RESPA both before and after the closing.

22.   Plaintiff, not being in the consumer lending, mortgage broker, or residential loan business, reasonably relied upon the Defendants to insure that the consumer credit transaction was legal, proper, and complied with all applicable laws, rules, and Regulations.

23.   At all times relevant hereto, Defendants regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four (4) installments and was initially payable to the person the subject of the transaction, rendering Defendants "creditors" within the meaning of the Truth-In-Lending Act, 15 U.S.C. sec. 1602(f) and Regulation Z sec. 226.2 (a)(17).

24.   At the closing of the subject "loan transaction", Plaintiff executed Promissory Notes and Security Agreements in favor of Defendants as aforesaid. These transactions designated by Defendants as a Loan, extended consumer credit which was subject to a finance charge and which was initially payable to the Defendants.

25.   As part of the consumer credit transaction the subject of the closing, Defendants retained a security interest in the subject property which was Plaintiff' principal residential dwelling.

26.   Defendant(s) have/has, directly or indirectly, in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme or artifice to defraud with scienter;

negligently obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or negligently engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

27.  Defendants engaged in a pattern and practice of defrauding Plaintiff in that, during the entire life of the mortgage loan, Defendants failed to properly apply credit payments made; incorrectly calculated interest on the accounts; and have failed to accurately debit fees. At all times material,

28.  Defendants had actual knowledge that the Plaintiff' accounts were not accurate but that Plaintiff would make further payments based on Defendants' inaccurate accounts.

29.  Plaintiff made payments based on the improper, inaccurate, and fraudulent representations as to Plaintiffs' accounts.

30.  as a direct and proximate result of the actions of the Defendants set forth above, Plaintiff overpaid in interest.

31.  Defendants also utilized amounts known to the Defendants to be inaccurate to determine the amount allegedly due and owing for purposes of foreclosure.

32. Defendants' violations were all material in nature under the Truth-In-Lending Act.

33. Said violations, in addition to the fact that Plaintiff did not properly receive Notices of Right to Cancel, constitute violations of 15 USC sec. 1635(a) and (b) and 12 CFR sec. 226.23(b),and are thus a legal basis for and legally extend Plaintiff' right to exercise the remedy of rescission.

34. Defendants assigned or attempted to assign the Note and mortgage to parties who did not take these instruments in good faith or without notice that the instruments were invalid or that Plaintiff had a claim in recoupment. Pursuant to ORC sec. 1303.32(A)(2)(b)(c) and (f), Defendants are not a holder in due course and is thus liable to Plaintiff, individually, jointly and severally.

35. On information and belief and given that the consumer credit transaction was an inter-temporal transaction with multiple assignments as part of an aggregation and the creation of a REMIC tranche itself a part of a predetermined and identifiable CMO, all Defendants shared in the illegal proceeds of the transaction; conspired with each other to defraud the Plaintiff out of the proceeds of the loan; acted in concert to wrongfully deprive the Plaintiff of their residence; acted in concert and conspiracy to essentially steal the Plaintiff' home and/or convert the Plaintiff' home without providing Plaintiff reasonably equivalent value in exchange; and conducted an illegal enterprise within the meaning of the RICO statute.

36.  On information and belief and given the volume of residential loan transactions solicited and processed by the Defendants, the Defendants have engaged in two or more instances of racketeering activity involving different victims but utilizing the same method, means, mode, operation, and enterprise with the same intended result.

**Claims for Relief**

**Count I: Violations of Home Ownership Equity Protection Act**

1.  Plaintiff hereby incorporates the allegations of all previous paragraphs 1-35 hereinabove as if set forth more fully herein below.

2.  In 1994, Congress enacted the Home Ownership Equity Protection Act ("HOEPA") which is codified at 15 USC sec. 1639 et seq. with the intention of protecting homeowners from predatory lending practices targeted at vulnerable consumers. HOEPA requires lenders to make certain de.ned disclosures and prohibits certain terms from being included in home loans. In the event of noncompliance, HOEPA imposes civil liability for rescission and statutory and actual damages.

3.  Plaintiff(s) are "consumers" and each Defendant is a "creditor" as defined by HOEPA. In the mortgage loan transaction at issue here, Plaintiff were required to pay excessive fees, expenses, and costs which exceeded more than 10% of the amount financed.

4.  Pursuant to HOEPA and specifically 15 USC sec. 1639(a)(1), each Defendant is required to make certain disclosures to the Plaintiff which are to be made conspicuously and in writing no later than three (3) days prior to the closing.

5.  In the transaction at issue, Defendants were required to make the following disclosure to Plaintiff by no later than three (3) days prior to said closing:

6.  "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligation under the loan."

7.  Defendants violated HOEPA by numerous acts and material omissions, including but not limited to:

    (a)  failing to make the foregoing disclosure in a conspicuous fashion;

    (b)  engaging in a pattern and practice of extending credit to Plaintiff without regard to their ability to repay in violation of 15 USC sec. 1639(h).

8.  By virtue of the Defendants' multiple violations of HOEPA, Plaintiff has a legal right to rescind the consumer credit transaction the subject of this action pursuant to 15 USC

§1635. This Complaint is to be construed, for these purposes, as formal and public notice of Plaintiff's Notice of Rescission of the mortgage and note.

9.   Defendants further violated HOEPA by failing to make additional disclosures, including but not limited to Plaintiff not receiving the required disclosure of the right to rescind the transaction;

10.   the failure of Defendants to provide an accurate TIL disclosure; and the amount financed being understated.

11.   As a direct consequence of and in connection with Plaintiff' legal and lawful exercise of the right of rescission, the true "lender" is required, within twenty (20) days of this Notice of Rescission, to:

(a)   desist from making any claims for finance charges in the transaction;

(b)   return all monies paid by Plaintiff in connection with the transaction to the Plaintiff;

(c)   satisfy all security interests, including mortgages, which were acquired in the transaction.

**Count II: Violations of Real Estate Settlement Procedures Act**

14.   Plaintiff reaffirm and re-allege paragraphs 1-13(f) above herein as if specifically set forth more fully herein below.

15.   As mortgage lenders, Defendants are subject to the provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 USC sec. 2601 et seq.

16.   In violation of 12 USC sec. 2607 and in connection with the mortgage loan to Plaintiff, Defendants accepted charges for the rendering of real estate services which were in fact charges for other than services actually performed.

17.   As a result of the Defendants' violations of RESPA, Defendants are liable to Plaintiff in an amount equal to three (3) times the amount of charges paid by Plaintiff for "settlement services" pursuant to 12 USC sec. 2607 (d)(2).

**Count III: Violations of Federal Truth-In-Lending Act**

18.   Plaintiff reaffirm and re-allege paragraphs 1-17 above hereinabove as if set forth more fully herein below.

19.   Defendants failed to include and disclose certain charges in the finance charge shown on the TIL statement, which charges were imposed on Plaintiff incident to the extension of

credit to the Plaintiff and were required to be disclosed pursuant to 15 USC sec. 1605 and Regulation Z

20.   sec. 226.4, thus resulting in an improper disclosure of finance charges in violation of 15 USC §1601 et seq., Regulation Z sec. 226.18(d). Such undisclosed charges include a sum identified on the Settlement Statement listing the amount financed which is different from the sum listed on the original Note.

21.   75. By calculating the annual percentage rate ("APR") based upon improperly calculated and disclosed amounts, Defendants are in violation of 15 USC sec. 1601 et seq., Regulation Z §226.18(c), 18(d), and 22.

22.   Defendants' failure to provide the required disclosures provides Plaintiff with the right to rescind the transaction, and Plaintiff, through this public Complaint which is intended to be construed, for purposes of this claim, as a formal Notice of Rescission, hereby elect to rescind the transaction.

**Count IV: Violation of Fair Credit Reporting Act**

23.   Plaintiff hereby incorporates the allegations of all previous paragraphs 1-22 above as if set forth more fully herein below.

24.  At all times material, Defendants qualified as a provider of information to the Credit

Reporting Agencies, including but not limited to Experian, Equifax, and Trans Union,

under the Federal Fair Credit Reporting Act. 65. Defendants wrongfully, improperly, and

illegally reported negative information as to the Plaintiff to one or more Credit Reporting

Agencies, resulting in Plaintiff having negative information on their credit reports and the

lowering of their FICO scores.

25.  The negative information included but was not limited to an excessive amount of debt

into which Plaintiff was tricked and deceived into signing.

26.  Notwithstanding the above, Plaintiff has paid the mortgage form August 1, 2007 through

September 2011.

27.  Pursuant to 15 USC sec. 1681(s)(2)(b), Plaintiff are entitled to maintain a private cause of

action against Defendants for an award of damages in an amount to be proven at the time

of trial for all violations of the Fair Credit Reporting Act which caused actual damages to

Plaintiff, including emotional distress and humiliation.

28.  Plaintiff is entitled to recover damages from Defendants for negligent non-compliance

with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681(o).

29. Plaintiffs are also entitled to an award of punitive damages against Defendants for their willful noncompliance with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681(n)(a)(2) in an amount to be proven at time of trial.

**Count V: Fraudulent Misrepresentation**

30. Plaintiff incorporates the above the allegations of all previous paragraphs 1-29 above as if set forth more fully herein below.

31. Defendants knowingly and intentionally concealed material information from Plaintiff which is required by Federal Statutes and Regulations to be disclosed to the Plaintiff both before and at the closing.

32. Defendant's also materially misrepresented material information to the Plaintiff with full knowledge by Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.

33. Under the circumstances, the material omissions and material misrepresentations of the Defendants were malicious.

34. Plaintiff, not being an investment banker, securities dealer, mortgage lender, mortgage broker, or mortgage lender, reasonably relied upon the representations of the Defendants in agreeing to execute the mortgage loan documents.

35. Had Plaintiff known of the falsity of Defendants' representations, Plaintiff would not have entered into the transactions the subject of this action.

36. As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Plaintiff's have suffered damages.

**Count VI: Breach of Fiduciary Duty**

37. Plaintiff incorporates the above the allegations of all previous paragraphs 1-36 above as if set forth more fully herein below.

38. Defendants, by their actions in contracting to provide mortgage loan services and a loan program to Plaintiff which was not only to be best suited to the Plaintiff given their income and expenses but by which Plaintiff would also be able to satisfy their obligations without risk of losing their home, were "fiduciaries" in which Plaintiff reposed trust and confidence, especially given that Plaintiff were not and are not investment bankers, securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders.

39. Defendants breached their fiduciary duties to the Plaintiff by fraudulently inducing Plaintiff to enter into a mortgage transaction which was contrary to the Plaintiff's stated intentions; contrary to the Plaintiff's interests; and contrary to the Plaintiff's preservation of their home.

40. As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Plaintiff has suffered damages.

41. Under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and with a callous and reckless disregard for the rights of the Plaintiff justifying an award of not only actual compensatory but also exemplary punitive damages to serve as a deterrent not only as to future conduct of the named Defendants herein, but also to other persons or entities with similar inclinations.

**Count VII: Unjust Enrichment**

42. Plaintiff hereby incorporates the allegations of all previous paragraphs 1-41 above as if set forth more fully herein below.

43. Defendants had an implied contract with the Plaintiff to ensure that Plaintiff understood all fees which would be paid to the Defendants to obtain credit on Plaintiff' behalf and to not charge any fees which were not related to the settlement of the loan and without full disclosure to Plaintiff.

44. Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees. rebates, kickbacks, profits (including but not limited to from resale of mortgages and notes using Plaintiff's identity, credit score and

reputation without consent, right, justification or excuse as part of an illegal enterprise scheme) and gains and YSP fee unrelated to the settlement services provided at closing.

45.   Defendants have been unjustly enriched at the expense of the Plaintiff, and maintenance of the enrichment would be contrary to the rules and principles of equity.

46.   Defendants have also been additionally enriched through the receipt of PAYMENT from third parties including but not limited to investors, insurers, other borrowers, the United States Department of the Treasury, the United States Federal Reserve, and Bank of America, N.A.

47.   Plaintiff thus demands restitution from the Defendants in the form of actual damages, exemplary damages, and attorneys' fees.

**Count VIII: Civil Conspiracy**

48.   Plaintiff reaf.rm and re-allege paragraphs 1-47 above as if set forth more fully herein below.

49.   In connection with the application for and consummation of the mortgage loan the subject of this action, Defendants agreed, between and among themselves, to engage in actions and a course of conduct designed to further an illegal act or accomplish a legal act

by unlawful means, and to commit one or more overt acts in furtherance of the conspiracy to defraud the Plaintiff.

50. Defendants agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of accruing economic gains for themselves at the expense of and detriment to the Plaintiff.

51. The actions of the Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Plaintiff.

52. As a direct and proximate result of the actions of the Defendants in combination resulting in fraud and breaches of fiduciary duties, Plaintiff has suffered damages.

53. Plaintiff thus demands an award of actual, compensatory, and punitive damages.

## Count IX: Civil Rico

54. Plaintiff hereby incorporates the allegations of all previous paragraphs 1-53 above as set forth more fully herein below.

55. Defendants are "persons" as defined by ORC sec. 2923.31(G).

56. The conspiracy the subject of this action has existed from date of application to the present, with the injuries and damages resulting there from being continuing.

57. Defendants' actions and use of multiple corporate entities, multiple parties, and concerted and predetermined acts and conduct specifically designed to defraud Plaintiff constitutes an "enterprise", with the aim and objective of the enterprise being to perpetrate a fraud upon the Plaintiff through the use of intentional nondisclosure, material misrepresentation, and creation of fraudulent loan documents.

58. Each of the Defendants is an "enterprise Defendant".

59. As a direct and proximate result of the actions of the Defendants, Plaintiff has and continues to suffer damages.

60. Complaint to Quiet Title to Real Property

61. Plaintiff hereby incorporates the allegations of all previous paragraphs 1-60 above as set forth more fully here in below.

62. Plaintiff has sent or has caused to be sent authorized Qualified Written Requests to the only known Defendants which said Defendants have failed and refused to answer despite acknowledging receipt thereof and despite demands from alleged mortgagee, and made a part hereof as specifically as if set forth at length here at. (Exhibit A)

63. Plaintiff has sent or has caused to be sent notice of her intent to rescind the subject loan transaction but has only sent those notices to the only entities that have been disclosed. Hence, without this action, neither the rescission nor the reconveyance which the Plaintiff is entitled to fie (as attorney in fact for the originating lender) and will fie contemporaneously with this complaint, gives Plaintiff full and clear title to the property.

64. The real party in interest on the lender side may be the owner of the asset backed security issued by the SPV, the insurer through some claim of equitable interest, or the Federal government through the United States Department of the Treasury or the Federal Reserve. The security is a "securitized" bond deriving its value from the underlying mortgages of which the subject mortgage is one. Thus Plaintiff is entitled to quiet title against Defendants, clearing title of the purported subject mortgage encumbrance.

65. Plaintiff is ignorant of the true names and capacities of defendants sued herein as JOHN AND JANE DOES inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

66. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

67.   Plaintiff is informed and believes and thereupon alleges that and each of the Defendants claim or might claim an interest in the property adverse to plaintiff herein. However, the claim of said Defendants is without any right whatsoever, and said Defendants have no legal or equitable right, claim, or interest in said property.

68.   Plaintiff therefore seeks a declaration that the title to the subject property is vested in plaintiff alone and that the defendants herein, and each of them, be declared to have no estate, right, title or interest in the subject property and that said defendants and each of them, be forever enjoined from asserting any estate, right, title or interest in the subject property adverse to plaintiff herein.

69.   WHEREFORE, in this Count, plaintiff prays this Court will enter judgment against defendants and each of them, as follows:

70.   For an order compelling said Defendant, and each of them, to transfer or release legal title and alleged encumbrances thereon and possession of the subject property to Plaintiff herein;

71.   For a declaration and determination that Plaintiff is the rightful holder of title to the property and that Defendant herein, and each of them, be declared to have no estate, right, title or interest in said property;

72. For a judgment forever enjoining said defendants, and each of them, from claiming any estate, right, title or interest in the subject property;

73. For costs of suit herein incurred;

74. For such other and further relief as the court may deem proper
USURY and FRAUD

75. Plaintiff reaffirm and re-allege the above paragraphs 1-74 hereinabove as if set forth more fully herein below. The subject loan, note, and mortgage was structured so as to create the appearance of a higher value of the real property than the actual fair market value.

76. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

77. Defendants disguised the transaction to create the appearance of the lender being a properly chartered and registered financial institution authorized to do business and to enter into the subject transaction when in fact the real party in interest was not disclosed to Plaintiff, as aforesaid, and neither were the various fees, rebates, refunds, kickbacks, profits and gains of the various parties who participated in this unlawful scheme.

78. Said real party in interest, i.e., the source of funding for the loan and the person to whom the note was transmitted or eventually "assigned" was neither a financial institution nor an entity or person authorized, chartered or registered to do business in this State nor to act as banking, lending or other financial institution anywhere else.

79. As such, this fraudulent scheme, (which was in actuality a plan to trick the Plaintiff into signing what would become a negotiable security (covered under UCC Article 9; Transfers of Mortgage Notes) used to sell unregulated securities under fraudulent and changed terms from the original note) was in fact a sham to use Plaintiff's interest in the real property to collect interest in excess of the legal rate.

80. The transaction involved a loan of money pursuant to a written agreement, and as such, subject to the rate limitation set forth under state and federal law. The "formula rate" referenced in those laws was exceeded by a factor in excess of 10 contrary to the applicable law and contrary to the requirements for disclosure under TILA and HOEPA.

81. Under Applicable law, the interest charged on this usurious mortgage prevents any collection or enforcement of principal or interest of the note, voids any security interest thereon, and entitles the Plaintiff to recovery of all money or value paid to Defendants, plus treble damages, interest, and attorney fees.

82. Under Applicable Law Plaintiff is also entitled and demand a permanent injunction be entered against the Defendants.

(a) Preventing them from taking any action or making any report in furtherance of collection on this alleged debt which was usurious, as aforesaid,

(b) Requiring the records custodian of the county in which the alleged mortgage and other instruments are recorded to remove same from the record,

(c) allowing the filing of said order in the office of the clerk of the property records where the subject property, "Loan transaction" and any other documents relating to this transaction are located and (d) dissolving any lis pendens or notice of pendency relating to the Defendants purported claim.

**Count X: Breach of Contract**

83.    DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY did not request the trustee to reconvey the property or surrender the security instrument evidencing the debt when all sums were paid. The mortgage lender's duty to discharge the security instrument was not requested by DELTA FUNDING d/b/a FIDELITY MORTGAGE OF NY therefore has breached the mortgage contract. When the note was sold and all sums are paid the release clause states "When all sums are paid the lender shall request the trustee reconvey the property or surrender the security instrument evidencing the debt." See EXHIBIT D

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### *ACKNOWLEDGEMENT OF NOTARY*

**RHODE ISLAND STATE**             *For verification purposes only*
**PROVIDENCE COUNTY**
*On the 21ˢᵗ day of  November, Two Thousand Twelve, before me,*

_____Maureen Baxter_____, *a Notary*
Name, Title of Officer of Notary Public

Personally appeared, carol danti: king, personally known to me (or proved to me on the basis of satisfactory evidence of identification) to be a person whose name is subscribed to the within instrument(s) and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person or the entity upon behalf of which the person acted, executed that instrument.

*Witnessed, my hand and official seal.*

                                                                                          seal

*My Commission Expires:*   3-14-2015

                                 At arm's length by: carol danti: king (seal)
                                                             carol danti: king,
                                             Authorized Representative, Attorney-In-Fact
                                                     for CAROL DANTI  KING

Exhibit A  Request for Debt Validation/November 19, 2012/21 pages
Exhibit B  RESPA Qualified Written Request/January 24, 2012/14 pages
Exhibit C  Corrective Mortgage Book 488 Page 79/October 5, 2007/22 pages
Exhibit D  Original Mortage Book 476 Page 109/June 5, 2007/22 pages
Exhibit E  Assignment of Mortgage/undated/1 page
Exhibit F  Korde & Associates letter/September 4, 2012/1 page
Exhibit G  Lepizzera & Laprocina letter/May 3, 2012/3 pages
Exhibit H  Joseph A Sciacca letter/April 13, 2012/1 page
Exhibit I   Lepizzera & Laprocina check #10586/1 page
Exhibit J  Counter Control Detail Report for October 5, 2007/6 pages
Exhibit K  Warranty Deed/June 5, 2007/1 page
Exhibit L  Legal Description of Land/6 pages
Exhibit M  "READ BEFORE SIGNING"/1 page
Exhibit N  FIXED RATE STEPPED PAYMENT NOTE/1 page
Exhibit O  Settlement Statement/2 pages